1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 10 DARNELL FOSTER, et al., | **MEMORANDUM & ORDER** |
| 11 Plaintiffs,<br>v. | **Re: Plaintiff Young's Motion for Partial<br>Summary Judgment** |
| 12 CITY OF OAKLAND, et al., | |
| 13 Defendants. | **No. C 05-3110  MHP** |
| 14 | |
| 15 This Document Relates To: | |
| 16 JAMES TAYLOR, et al., | No. C 04-4843 MHP |
| 17 Plaintiffs, | |
| 18 v. | |
| 19 CITY OF OAKLAND, et al., | |
| 20 Defendants. | |
| 21 | |
| 22 JIMMY RIDER, et al., | No. C 05-3204 MHP |
| 23 Plaintiffs, | |
| 24 v. | |
| 25 CITY OF OAKLAND, et al., | |
| 26 Defendants. | |
| 27 *JOINT CAPTION CONTINUED ON NEXT PAGE* | |

28

United States District Court

For the Northern District of California

| | |
|---|---|
| 1 TYRONE MOORE, | No. C 06-2426 MHP |
| 2 Plaintiff, | |
| 3 v. | |
| 4 CITY OF OAKLAND, et al., | |
| 5 Defendants. | |

| | |
|---|---|
| 6 JEFFRIE MILLER, et al., | No. C 07-1773 MHP |
| 7 Plaintiffs, | |
| 8 v. | |
| 9 CITY OF OAKLAND, et al., | |
| 10 Defendants. | |
| 11 | |

| | |
|---|---|
| 12 DAVID WARD, et al., | No. C 07-4179 MHP |
| 13 Plaintiffs, | |
| 14 v. | |
| 15 CITY OF OAKLAND, et al., | |
| 16 Defendants. | |
| 17 | |

| | |
|---|---|
| 18 JOHN SMITH, et al., | No. C 07-6298 MHP |
| 19 Plaintiffs, | |
| 20 v. | |
| 21 CITY OF OAKLAND, et al., | |
| 22 Defendants. | |

| | |
|---|---|
| 23 TERRELL TURNER, et al., | No. C 08-3114 MHP |
| 24 Plaintiffs, | |
| 25 v. | |
| 26 CITY OF OAKLAND, et al., | |
| 27 Defendants. | |
| 28 *JOINT CAPTION CONTINUED ON NEXT PAGE* | |

United States District Court
For the Northern District of California

2

1  LAWRENCE COLEY, et al.,                                No. C 08-4255 MHP

2                  Plaintiffs,

3         v.

4  CITY OF OAKLAND, et al.,

5                  Defendants.
                                                    /
6

7         Plaintiffs Darnell Foster, Rafael Duarte and Yancie Young brought this against municipal and

8  individual defendants, including Oakland police officer William Bergeron, pursuant to 28 U.S.C.

9  section 1983. Plaintiffs allege various violations of their constitutional rights through a policy and

10  practice of performing strip searches and body-cavity searches in public. Now before the court is a

11  motion for partial summary judgment on behalf of plaintiff Young only. Young seeks a declaratory

12  judgment and finding of liability against defendant Bergeron as to Young's Fourth Amendment

13  claim for unreasonable search and seizure. Having considered the parties' arguments and

14  submissions, the court enters the following memorandum and order.

15

16  BACKGROUND

17  I.      Events of September 30, 2003

18         On September 30, 2003, at approximately 11:30 p.m., defendant Bergeron pulled plaintiff

19  Young over at approximately the 2800 block of West Street, in Oakland, California. Young is an

20  African-American man and was wearing blue jeans, a belt, a shirt and shoes. Docket No. 103[1]

21  (Haddad Dec.), Exh. A (Young Depo.) at 19. Young was not on probation or parole. Bergeron, who

22  was driving his patrol car with a partner, Officer Bernard Ortiz, first observed Young's car as it

23  turned from 29th Street onto West Street. *Id.*, Exh. B (Bergeron Dep.) at 24. According to

24  Bergeron, Young's car seemed to have been traveling "faster than it should have been for having to

25  stop at a stop sign." Bergeron admits that he did not actually see Young roll through the stop sign

26  and did not witness any sort of moving violation at the area of the stop sign. *Id.* Bergeron did notice

27  an air freshener hanging from Young's rearview mirror. The air freshener was, according to

28  Bergeron, "one of the Christmas tree or the tree-shaped air fresheners." According to Bergeron, the

United States District Court
For the Northern District of California

3

1    dimensions of the air freshener were four to five inches long by two to four inches wide. *Id.* at 25.

2    Bergeron believed that the air freshener hanging from Young's rearview mirror constituted a

3    violation of California Vehicle Code 26708(a)(2), which prohibits the driving of a vehicle "with any

4    object or material placed . . . in or upon a vehicle that obstructs or reduces the driver's clear view

5    through the windshield or side windows." *Id.*; *see* Cal. Veh. Code § 26708(a)(2). For this reason,

6    Bergeron pulled Young over. Bergeron Dep. at 24-25.

7        After Young pulled his car over, Bergeron approached the driver's side window of Young's

8    car. Bergeron told Young why he had been stopped, stated that Bergeron needed to remove the air

9    freshener, and asked for Young's driver's license, registration and insurance. *Id.* at 25, 28. During

10    this process, Bergeron smelled a strong odor of fresh marijuana coming from inside the vehicle. He

11    also observed a bunch of small pieces of what he believed to be marijuana crumbs on the front of

12    Young's shirt. *Id.* at 28-29. Bergeron believed there was probable cause to arrest Young for

13    possession of marijuana for use or distribution. The odor emanating from the car was so strong that

14    Bergeron believed there to be more marijuana in the car or on Young's person. *Id.* at 29-30. It

15    smelled like a significant amount. *Id.* at 61. Ortiz also smelled a very potent smell of marijuana

16    emanating from Young's car. Docket No. 108 (Def.'s Supporting Evid.), Exh. 4, Attachment 3

17    (Ortiz Depo.) at 5-6. According to Bergeron, Young admitted at some point that he had smoked

18    marijuana earlier that day. *Id.*, Attachment 1, Exh. 2 (comment on field contact report); Bergeron

19    Depo. at 60. Bergeron did not know Young and had never heard of him prior to stopping him.

20    Bergeron Depo. at 61.

21        Young was asked to step out of his car. *Id.* at 32. After Bergeron handcuffed Young, he

22    recovered the substance from Young's shirt by scraping it off with an assignment card. *Id.* at 30.

23    Later, Bergeron packaged the substance in an Oakland Police Department ("OPD") Criminalistics

24    Section envelope, but Bergeron does not know if the substance was ever tested to confirm whether it

25    was marijuana. *Id.* at 32.

26        Bergeron took Young to the rear of the police car on the driver's side. *Id.* at 33. Using a

27    grasping hand technique, Bergeron conducted a pat-down search of Young's entire body, with

28    Young facing away from Bergeron and toward the police car. The pat-down did not reveal any

1   marijuana or other contraband. *Id.* at 35. Bergeron does not recall requiring Young to take his shoes
2   off. *Id.* at 43. Based on the continuing marijuana smell, the apparent pieces of marijuana on the
3   front of Young's shirt, and Bergeron's experience and training, Bergeron suspected Young had
4   concealed marijuana under his clothing. *Id.* at 35-38. Bergeron turned Young around and grabbed
5   the front of Young's pants. According to Bergeron's version of what followed, which must be
6   accepted as true for purposes of the instant motion, Bergeron pulled the front of Young's pants out
7   and shined his flashlight down the front. Bergeron did not pull Young's underwear out so as to see
8   Young's privates. The visual inspection lasted "less than ten seconds for sure." *Id.* at 40.

9       At the same time that Bergeron shined his flashlight down Young's pants, Ortiz was
10  searching "every part of [Young's] car that [he] could think of." Ortiz Depo. at 11. Bergeron placed
11  Young in the patrol car and then conducted a records check of Young via the vehicle computer in the
12  police car. Bergeron Depo. at 58-59. The records check showed that Young did not have any
13  warrants at that time. *Id.* at 59. Bergeron then assisted Ortiz in searching Young's vehicle. *Id.* No
14  contraband was found, despite what smelled like a significant amount of fresh marijuana. *Id.* at 60-
15  61. Unable to find the source of the smell, Bergeron and Ortiz conferred with a sergeant who was
16  not on the scene. The officers decided to call a canine officer, Diane Nichelini, to the scene. *Id.* at
17  62. Nichelini arrived and could smell the marijuana from ten feet away. Def.'s Supporting Evid.,
18  Exh. 4, Attachment 4 (Nichelini Depo.) at 6-8. During a ten-to-fifteen minute search, her dog got a
19  "hit" in the rear of the car, but the dog did not give Nichelini a "true alert." The officers checked the
20  rear seat area of the car but were again unable to locate any contraband. *Id.* at 9-10; Bergeron Depo.
21  at 63. After completing their search, the officers released Young pursuant to California Penal Code
22  section 849(b). *Id.*; *see* Cal. Penal Code § 849(b) (allowing release from custody without booking of
23  individual arrested without warrant where officer is satisfied insufficient grounds exist for making a
24  criminal complaint). Although Bergeron thought the substance found on Young's shirt was
25  marijuana, Bergeron concluded that it was not a "usable amount" and therefore was not enough to
26  provide the basis for a citation. Bergeron Depo. at 32. The OPD Computer Aided Dispatch (CAD)
27  report indicates that Bergeron pulled Young over at 11:33 p.m. and that Bergeron left the scene at
28  1:11 a.m. Haddad Dec., Exh. C (CAD Report); *see* Bergeron Depo. at 63-66.

United States District Court
For the Northern District of California

5

II.     The 1998 OPD Strip Search Policy

        At the time of the incident, Bergeron did not believe the type of search he performed on

Young was a "strip search." *Id.* at 43, 48. At that time, OPD had a policy in place entitled "The

Legal Aspects of Searching Persons." This policy had been in place since 1998. Haddad Dec.,

Exh. D (1998 Policy) at 1. It defined a strip search as "any search that requires the officer to remove

or arrange some or all of a person's clothing to permit a visual inspection of the subject's

underclothing, breasts, buttocks, or genitals." *Id.* at 8. The policy further instructed,

> A strip search or visual body-cavity search may be conducted only if all of the
> following conditions are met:
> *   The person to be searched must be under arrest and ultimately booked.
> *   The arrest must be for an offense involving weapons, controlled substances, or
>     violence.
> *   The person conducting the search must be of the same sex as the person
>     searched.
> *   The search must be conducted in a private area where it cannot be observed by
>     persons not participating in the search.

*Id.* Bergeron admits the he was required to be knowledgeable of all official policies of the OPD.

Bergeron Dec. at 7-8. He also specifically admits that he was required to be knowledgeable of the

1998 policy on strip searches in effect at the time of the incident. *Id.* at 9-10.

III.    Relevant Procedural History

        Plaintiffs Foster and Duarte filed the present action on August 1, 2005. Pursuant to

stipulations, plaintiffs filed an amended complaint on September 22, 2005, adding plaintiff Young.

On March 27, 2008, the court partially granted and partially denied plaintiffs' partial motion for

summary judgment. Docket No. 71 ("March 2008 Order"). Plaintiffs moved for partial summary

judgment on the following grounds: declaratory relief that the OPD's 1998 strip search policy was

unconstitutional; declaratory relief that the 2004 amended policy was unconstitutional; judgment that

any search in accordance with either of the policies was unconstitutional; and summary judgment on

the issue of liability in favor of plaintiffs. The court held the 1998 policy to be unconstitutional

insofar as it allowed physical body cavity searches to be performed by someone other than a medical

professional. *Id.* at 18. The 2004 policy was found to be unconstitutional to the extent it allowed

strip searches of any kind to be performed in the field on less than probable cause. *Id.* at 19. The

United States District Court
For the Northern District of California

6

1 other parts of plaintiffs' motion for summary judgment were denied. Plaintiff Young thereafter filed
2 the instant motion.

3

4 LEGAL STANDARD

5 Summary judgment may be granted only when, drawing all inferences and resolving all
6 doubts in favor of the non-moving party, there are no genuine issues of material fact and the moving
7 party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see generally Anderson v.*
8 *Liberty Lobby, Inc.*, 477 U.S. 242, 247-255 (1986). A fact is "material" if it may affect the outcome
9 of the proceedings, and an issue of material fact is "genuine" if the evidence is such that a reasonable
10 jury could return a verdict for the non-moving party. *Id.* at 248. The court may not make credibility
11 determinations. *Id.* at 255. The moving party bears the burden of identifying those portions of the
12 pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact.
13 *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden,
14 the non-moving party must go beyond the pleadings and, by its own affidavits or discovery, set forth
15 specific facts showing that there is a genuine issue for trial. Fed R. Civ. P. 56(e); *see Anderson*, 477
16 U.S. at 250.

17

18 DISCUSSION

19 Plaintiff Young seeks summary judgment on his claim that defendant Bergeron violated his
20 Fourth Amendment right to be free from unreasonable search and seizure. Young focuses his
21 arguments on three actions taken by Bergeron: (1) the initial stop of Young on the basis of California
22 Vehicle Code subsection 26708(a)(2); (2) the arrest of Young on the suspicion he possessed
23 marijuana; and (3) the alleged strip search of Young.[2] Bergeron argues that his actions were lawful
24 and that he is, in any event, protected from liability by the doctrine of qualified immunity.

25 I.     The Investigatory Stop

26 Young argues that Bergeron unlawfully stopped his vehicle on the basis of an alleged
27 violation of California Vehicle Code 26708(a)(2) ("subsection (a)(2)"). "Under the Fourth
28 Amendment, government officials may conduct an investigatory stop of a vehicle only if they

7

possess reasonable suspicion: a particularized and objective basis for suspecting the particular person stopped of criminal activity. Such reasonable suspicion requires specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that a particular person is engaged in criminal conduct." *United States v. Twilley*, 222 F.3d 1092, 1095 (9th Cir. 2000) (citations and internal quotation marks omitted).

On February 27, 2003, approximately seven months before the incident at issue on this motion, the California Court of Appeal held a vehicle stop based on the same vehicle code provision and the same type of air freshener as Young's to have been unreasonable. *People v. White*, 107 Cal. App. 4th 636 (2003). In that case, a patrol officer stopped a car with a tree-shaped air freshener hanging from the rearview mirror.[3] *Id.* at 640-641. Upon making contact with the driver of the vehicle, the officer smelled marijuana and subsequently discovered over five pounds of marijuana and other contraband. An occupant of the vehicle, White, was convicted of transporting marijuana in violation of California law. He appealed the trial court judge's denial of his suppression motion. *Id.* at 639-640.

The Court of Appeal reversed the lower court, holding that reasonable suspicion was lacking. The court found that subsection (a)(2) does not flatly prohibit hanging any object from a rearview mirror. Rather, subsection (a)(2) proscribes the placement of articles in or upon the vehicle which "obstruct or reduce the driver's clear view through the windshield or side windows." *See* Cal. Veh. Code § 26708(a)(2). The officer never testified that he believed the air freshener obstructed the driver's view. He also did not testify to specific and articulable facts, like erratic driving, that might suggest the driver's view was impeded. Moreover, an expert had testified that the air freshener covered less that 0.05 percent of the windshield of the car at issue. *Id.* at 642. The court held, "[o]n this record," that it was not objectively reasonable to believe the air freshener obstructed or reduced the driver's clear view through the windshield in violation of the vehicle code. *Id.*

Bergeron does not dispute Young's contention that his air freshener was the same "ubiquitous" air freshener at issue in *White*. According to Young, Bergeron should have known at the time of the incident with Young that a tree-shaped air freshener hanging from a rearview mirror cannot be the factual basis for a violation of subsection (a)(2). Young's reading of *White* is too

8

narrow.[4] *White* rejects a construction of the code section that would flatly prohibit hanging a tree-shaped air freshener from a rearview mirror; however, it does not adopt the position that such an item can never provide the basis for a stop. Aside from Bergeron's very general description of the air freshener, neither party has submitted evidence pertaining to the size of his windshield, the exact size of the air freshener or any other factor that would shed light on whether the air freshener reduced Young's view. While Bergeron admitted he did not see any moving violation, he testified in his deposition that Young's car looked as if it had been traveling "faster than it should have been for having to stop at a stop sign." Whether these facts are sufficiently specific and articulable to support "reasonable suspicion" depends upon the credibility of Bergeron and must be weighed by the finder of fact rather than decided on summary judgment.

II.     The Arrest

The parties agree that Bergeron placed Young under arrest at the point Bergeron handcuffed Young while Young sat in the driver's seat of his car. *See* Bergeron Depo. at 29. While it is not clear whether this was technically an arrest, it was a seizure for Fourth Amendment purposes. Young contends that Bergeron lacked probable cause. The Fourth Amendment requires that a law enforcement officer have "probable cause" to arrest an individual without a warrant. *United States v. Jensen*, 425 F.3d 698, 704 (9th Cir. 2005), *cert. denied*, 126 S.Ct. 1664. "The test for whether probable cause exists is whether 'at the moment of arrest the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" *Id.* (quoting *United States v. Bernard*, 623 F.2d 551, 559 (9th Cir. 1980)). "A determination as to whether probable cause exists requires a practical, common-sense decision based on the totality of the circumstances, including the veracity, basis of knowledge and reliability of the information provided by informants." *Id.* (internal quotation marks omitted) (citing *Illinois v. Gates*, 462 U.S. 213, 214 (1983)). "Hunches" or "gut feelings" are insufficient to establish reasonable suspicion, let alone probable cause. *United States v. Johnson*, 256 F.3d 895, 905 (9th Cir. 2001) (en banc).

1         For the purposes of this motion, the court accepts as true Bergeron's testimony that he

2 smelled a strong scent of fresh marijuana and that he saw crumbs on Young's shirt that looked like

3 marijuana. Young objects that Bergeron had no definitive proof that any such crumbs were

4 marijuana. He contends that any odor Bergeron smelled, combined with the crumbs, was not enough

5 to constitute probable cause that Young had committed a crime. In Young's view, Bergeron merely

6 had a hunch that Young had large quantities of marijuana.

7         It must first be noted that Bergeron was not required to have probable cause to suspect Young

8 had "large quantities" of marijuana, as Young's counsel repeatedly characterizes the inquiry. A more

9 proper question is whether Bergeron had probable cause to believe Young had enough marijuana to

10 violate the law. A second important question is whether at the time of the arrest Bergeron believed

11 he had probable cause to arrest Young for a felony or only a misdemeanor, which is a citable offense

12 under California Penal Code section 853.6. An odor, by itself, can be the basis for probable cause if

13 the affiant is qualified to know the odor and it is one sufficiently distinctive to identify a forbidden

14 substance. *See United States. v. DeLeon*, 979 F.2d 761, 765 (9th Cir. 1992) (citing *Johnson v.*

15 *United States*, 333 U.S. 10, 13 (1948)). Bergeron has been a sworn peace officer since 1990 and

16 spent approximately three years assigned to OPD's Vice Narcotics Unit prior to the incident with

17 Young. Bergeron Depo. at 5. Bergeron and the two other officers who were on the scene have

18 testified that they smelled marijuana. Young has not challenged the respective qualifications of any

19 of these police officers to recognize the scent of fresh marijuana. Drawing inferences in favor of the

20 non-moving party, the court must conclude that the officers were qualified to recognize the distinct

21 odor of marijuana.

22         Young's assertions that Bergeron arrested him simply on a "hunch" are unpersuasive.

23 Bergeron was confronted with the strong evidence of his senses, not simply a gut feeling. The strong

24 scent of fresh marijuana coupled with the sight of a substance the officer believed to be marijuana

25 warranted the belief that Young had committed or was committing an offense. But, if Bergeron did

26 not have probable cause to arrest Young for a felony rather than a citable misdemeanor, the extent of

27 the search of Young's person conducted thereafter may be affected. It would appear on the facts in

28 this record that Bergeron did not have probable cause to arrest for a felony since the only evidence he

United States District Court

For the Northern District of California

10

had was the collection of crumbs found on Young. Although the parties have stipulated this was an arrest, the facts suggest that it was more likely a detention. Nonetheless, this presents other problems with the validity of the strip search. Without full development of the facts at trial the court cannot determine whether the seizure was an arrest or detention.

III.    The Strip Search

Finally, Young argues that Bergeron conducted an unlawful strip search of him.[5] This court's March 2008 order used the definition of "strip search" provided in section 4030(c) of the California Penal Code, which defines "strip search" as "a search which requires a person to remove or arrange some or all of his or her clothing so as to permit a visual inspection of the underclothing, breasts, buttocks, or genitalia of such person." March 2008 Order at 11; *see* Cal. Penal Code § 4030(c). Defendant Bergeron now urges that this definition is too broad.[6] According to Bergeron, simply pulling back Young's pants, but not his underwear, to visually inspect inside his pants does not constitute a "strip search" and should not be subject to the Fourth Amendment test for constitutionality of strip searches in the field. According to Bergeron, the sort of search he performed on Young is "minimally intrusive," indeed in some ways even less intrusive than a pat-down search. Bergeron relies upon a recent California Court of Appeal case. *See People v. Smith*, 172 Cal. App. 4th 1354 (2009). In that case, criminal defendant Smith appealed denial of a suppression motion, arguing he was subject to an unconstitutional strip search. On patrol, the officers in that case had spotted a man trying to open the window of a hotel room in a high-crime neighborhood. They then saw a second man, Smith, sitting in the driver's seat of a car parked directly in front of the same hotel room. An officer approached Smith and asked if he was on parole. Smith answered in the affirmative and gave permission for the officers to search his car. The officers conducted a pat-down search of Smith and a thorough search of his car, and found no contraband. Because of the high incidence of drug activity in the area, Smith's own history of selling drugs, and the officers own "feeling" Smith had contraband in his underwear, one of the officers removed Smith's belt, unzipped his pants, pulled them down "a foot or so," and pulled the elastic waistband out away from Smith's body. Tho officer saw a large bag the size of a baseball sitting "right on top

11

1  of his penis."[7] The officer retrieved the bag, which contained several smaller baggies of heroin,
2  cocaine and methamphetamine. *Id.* at 1357-1358.

3  The court held the search to have been reasonable, relying heavily on the fact that Smith was
4  a parolee. *See id.* at 1360 ("Here, this analysis turns on Smith's status as a parolee."), 1363 ("We
5  agree with the trial court's conclusion that Smith was not subjected to a public strip search. . . . . We
6  deem the intrusiveness of the search even less significant in light of our conclusion that Smith had a
7  sharply diminished expectation of privacy as a parolee."). For this reason, *Smith* is inapposite to the
8  instant case, where Young was not on probation or parole and the officers knew nothing about any
9  drug-related activities of Young. Furthermore, the *Smith* court found that the officers had taken steps
10 such as conducting the search "in an area that did not face the street, was fenced-off on at least one
11 side, and was not heavily frequented." *Id.* at 1363. The officers also placed Smith inside the crook
12 between the door of the patrol car and the body of the car, and stood around him to obstruct
13 visibility. *Id.* Bergeron does not contend that he took any of these steps. Finally, it is worth noting
14 that the sequence of Bergeron's search differed markedly from the *Smith* search. Believing that
15 Smith had contraband, the officers first patted down Smith and throughly searched his vehicle. It
16 was only when they were unable to find contraband in any other location that they concluded any
17 contraband Smith had must be stashed in his underwear. In the instant case, Bergeron believed that
18 there was fresh marijuana either in Young's car or on Young's person. Bergeron Depo. at 30. Yet
19 Bergeron searched Young's underwear *before* the search of the car was completed. *Id.* at 58-59. In
20 short, even if *Smith* were controlling, it would be distinguishable on its facts. Although the Smith
21 court couched the question rhetorically as a definitional one—i.e., was Smith subjected to a "strip
22 search"?—the inquiry undertaken by the court was actually a substantive analysis of whether the
23 specific circumstances in that case amounted to a Fourth Amendment violation. The case did not
24 turn on the issue of whether the nomenclature of "strip search" applied.

25 Neither do the federal cases relied upon by *Smith* support Bergeron's assertion that the search
26 of Young was not a "strip search" and was therefore permissible under the Fourth Amendment. In
27 *United States v. Williams*, 477 F.3d 974 (8th Cir. 2007), the officers had obtained a search warrant
28 for the suspect's home. After observing the suspect, Williams, drive away from his home, the

officers conducted a traffic stop. A pat-down search revealed something in Williams's pants. The · officers took Williams into custody, placed him in a squad car, and drove him several blocks to the police department's precinct building. They searched Williams in the parking lot and reached into his underwear to retrieve a large amount of crack and cocaine near his genitals. *Id.* at 975. The court did not consider this search to be a "full-blown strip search" and found the search to be reasonable under the circumstances. *Id.* at 976. While instructive, this case is inapposite because the pat-down search had given the officers reason to believe that Williams had hidden contraband in his underwear. Moreover, the court found that the officers had taken a number of effective steps to protect Williams's privacy. *See id.* at 977. Similarly, the officer in *United States v. Ashley*, 37 F.3d 678 (D.C. Cir. 1994), had proceeded to open the suspect's pants only after feeling an object his training indicated was a bag of crack cocaine during a pat-down search. *Id.* at 679-680. Bergeron cites these cases for the proposition that a "reach in" or a visual inspection of the underwear is not a "strip search." Yet the result of neither case turns on the terminology employed.

Bergeron provides no support, either in the form of evidence or legal authority, to buttress his contention that a person would ordinarily find a visual search of undergarments to be less intrusive than a pat-down search. In summary, there is no reason for this court to conclude that a visual inspection of Young's underwear was not a "strip search," a conclusion which would conflict with the definition of the phrase found not only in California Penal Code section 4030(c)[8] but also the OPD's own policy in place in 2003.

The next question is whether the strip search of Young violated his Fourth Amendment right to be free of unreasonable search and seizure. The constitutionality of a search is assessed by balancing the need for the particular search against the invasion of personal rights that the search entails. This requires the court to weigh the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. *Way v. County of Ventura*, 445 F.3d 1157, 1160 (9th Cir. 2006) (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell*, 441 U.S. at 559.

13

1    Based on a detailed review of the case law concerning strip searches and body cavity

2  searches, this court articulated Fourth Amendment requirements for strip searches in the field, in the

3  context of determining whether a given police department policy is constitutional. Because the

4  Fourth Amendment test is not a bright line rule, this list is non-exhaustive when applied to questions

5  of liability arising out of particular incidents; other factors must be considered as appropriate to the

6  individual circumstances. In order to justify a strip search in the field: (1) there must be exigent

7  circumstances; (2) the search may only be performed on persons who have been lawfully arrested on

8  probable cause and may not be performed on anyone for whom there is no probable cause to arrest;

9  (3) the search requires probable cause that is independent of the probable cause found for the arrest;

10  and (4) the search may only be performed when there is probable cause to believe that the arrestee is

11  in possession of weapons, drugs or dangerous contraband. Order of March 2008 at 15 (and

12  authorities cited therein).

13    In the instant case, Bergeron does not even attempt to argue in his opposition that the strip

14  search of Young met these requirements. Bergeron does not assert that exigent circumstances

15  obtained, and indeed it is difficult to imagine how Young would have ingested, hidden or destroyed

16  any narcotics in his underwear while securely handcuffed in the back of the squad car. Nor does

17  Bergeron point to any genuine issue of material fact regarding independent probable cause to strip

18  search Young. There is no evidence that Bergeron had reason to believe Young was secreting

19  marijuana in his underwear, other than a hunch or a gut feeling. Bergeron has testified that he saw

20  Young make "furtive movements" inside the vehicle before Bergeron approached the car, but this

21  statement lacks specificity and is partially contradicted by Bergeron's deposition testimony that he

22  never saw Young trying to destroy marijuana.[9] Bergeron Depo. at 38. This is insufficient to create a

23  genuine issue of fact. Moreover, Bergeron himself testified that the smell of marijuana emanated

24  either from Young's car or from Young. As noted, Bergeron searched Young before completing the

25  search of the car, undermining the assertion that Bergeron had some specific reason to believe the

26  marijuana must be on Young's person, as opposed to lying undiscovered in the car.

27    The manner in which the search was performed, with apparent disregard for any privacy

28  interest of the suspect also points to the unreasonableness of the search. Unlike officers in cases like

14

1 *Williams*, Bergeron did not take any steps to protect Young's privacy such as taking Young to a
2 private location or even searching him in the crook of the car door. Bergeron instead pulled out
3 Young's pants and looked into them in the middle of the street.

4 In summary, Bergeron has raised no genuine issue of material fact that exigent circumstances
5 obtained or that independent probable cause existed to believe Young was hiding drugs in his
6 underwear. Nor has he provided evidence that any steps were taken to protect Young's privacy or
7 pointed to any other factors specific to this case that weigh against a finding of a Fourth Amendment
8 violation. Even accepting Bergeron's version of the events as true, the search conducted on Young
9 violated Young's Fourth Amendment rights.

10 IV.    Qualified Immunity

11 Even if a law enforcement officer violates an individual's constitutional rights, the officer
12 may be protected by the doctrine of qualified immunity. Qualified immunity shields a public official
13 from individual liability for civil damages under 42 U.S.C. section 1983 so long as his conduct does
14 not "violate clearly established statutory or constitutional rights of which a reasonable person would
15 have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two
16 important interests—the need to hold public officials accountable when they exercise power
17 irresponsibly and the need to shield officials from harassment, distraction, and liability when they
18 perform their duties reasonably. The protection of qualified immunity applies regardless of whether
19 the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed
20 questions of law and fact." *Pearson v. Callahan*, ___ U.S. ___, ___, 129 S.Ct. 808, 815 (2009)
21 (citation and internal quotation marks omitted). Qualified immunity "provides ample protection to
22 all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S.
23 335, 341 (1986). As qualified immunity provides immunity from suit and is not merely a defense to
24 liability, it is important to "resolv[e] immunity questions at the earliest possible stage in litigation."
25 *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

26 In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court articulated an inquiry for
27 determining whether qualified immunity is appropriate. For an official to benefit from qualified
28 immunity, two requirements must be met. First, the court must determine whether, taken in the light

United States District Court
For the Northern District of California

15

1   most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated
2   a constitutional right. *Id.* at 201. Second, the court must consider whether any constitutional right
3   that was violated was so clearly established that a reasonable officer would understand that what he
4   is doing violates that right. *Id.* at 202. The second inquiry is particularized, as it occurs in the
5   specific context of the situation confronted by the official. *Id.*; *see also Rudebusch v. Hughes*, 313
6   F.3d 506, 514 (9th Cir. 2002). The *Saucier* inquiry articulated the first question as a threshold
7   question; however the Court recently held that lower courts may "exercise their sound discretion in
8   deciding which of the two prongs of the qualified immunity analysis should be addressed first in
9   light of the circumstances in the particular case at hand." *Pearson*, 129 S.Ct. at 818.

10         Bergeron points out that this court recognized in March 2008 "What is not clear is the extent
11   to which a strip search may be conducted in the field." *See* March 2008 Order at 14. Indeed, as the
12   court noted, there has been very little case law both on strip searches in the field and on the
13   requirements for performing strip searches that do not rise to the level of physical or visual body
14   cavity searches. While the Ninth Circuit has had occasion to determine the constitutionality of
15   various strip search policies, those cases dealt with blanket strip searches conducted at a police
16   station or other detention facility. *See, e.g., Giles v. Ackerman*, 746 F.2d 614 (9th Cir. 1984)
17   (holding unconstitutional pre-booking search of arrestee for minor traffic violation conducted
18   pursuant to blanket strip search policy), *overruled on other grounds by, Hodgers-Durgin v. de la*
19   *Vina*, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999); *Kennedy v. Los Angeles Police Dep't*, 901 F.2d 702
20   (9th Cir. 1990) (holding unconstitutional city's blanket policy of performing visual body cavity
21   searches on all felony arrestees), *overruling on other grounds recognized in, Act Up!/Portland v.*
22   *Bagley*, 971 F.2d 298, 301 (9th Cir. 1992); *Fuller v. M.G. Jewelry*, 950 F.2d 1437 (9th Cir. 1991)
23   (holding unconstitutional strip search at police station pursuant to blanket policy).

24         Bergeron argues that if the parameters of a permissible strip search in the field were not yet
25   established in 2008, they could not have been clearly established in the mind of a reasonable police
26   officer in 2003. Young contends that Bergeron should have known that the conditions for
27   conducting a strip search on the street are logically more stringent than those for conducting a strip
28   search in a jail facility. Young also argues that Bergeron was on notice that his actions were

16

unconstitutional because they violated the OPD's own strip search policy. Where a police department has articulated an institutional policy pertaining to a practice, such policy is a factor in determining both whether the officer acted reasonably and whether he was on notice that actions transgressing the policy violated an established right. *See Drummond v. City of Anaheim*, 343 F.3d 1052, 1061-1062 (9th Cir. 2003) (holding police department training materials' discussion of danger of compression asphyxia relevant to both reasonableness and notice practice was unconstitutional); *Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125, 1131 (9th Cir. 2002) (holding right clearly established in part through regional and state-wide police practice). Bergeron plainly violated the OPD's policy regarding strip searches insofar as he did not ultimately book Young and did not conduct the search in a private area where the search could not be observed by persons not participating in the search.[10] Furthermore, despite the agreement of the parties, it is not clear on the record before the court whether the seizure of Young can be characterized as an arrest.

This is not the sort of case in which qualified immunity has been, or could have been, successfully invoked early in the litigation. Important disputes of material fact as to what actually happened during the incident in question remain unresolved. Based on the foregoing, the court cannot make a ruling at this time on the qualified immunity issue.

## CONCLUSION

For the foregoing reasons, plaintiff Young's motion is GRANTED only as to the finding that defendant Bergeron violated as a matter of law plaintiff's Fourth Amendment rights by conducting an unlawful strip search on plaintiff. Plaintiff's motion is in all other respects DENIED. Remaining issues concerning the investigatory stop and arrest, qualified immunity, and any damages that may be due to plaintiff cannot be adjudicated on this summary judgment motion.

IT IS SO ORDERED.

Dated: *Dec. 14, 2009*

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

17

**United States District Court**
For the Northern District of California

**ENDNOTES**

1.      Unless otherwise indicated, all references to docket numbers refer to the docket in Case No. C 04-4843.

2.      Plaintiff does not challenge the constitutionality of the search of his vehicle.

3.      In *White*, the officer also cited a second, independent ground for stopping the vehicle: the absence of a front licence plate. The car was licensed in Arizona, a state that issues only a rear license plate. The court found that California law did not require a front license plate for a car registered in another state when that state did not require a front plate. 107 Cal. App. 4th at 643. The court also held there to be no good faith exception to the exclusionary rule for police who enforce a legal standard that does not exist. Id. at 644.

4.      Indeed, a later California Court of Appeal case, again addressing the same section of the vehicle code and the same ubiquitous tree-shaped air freshener, distinguished *White* and denied a suppression motion. *People v. Colbert*, 157 Cal. App. 4th 1068 (2007). As Young notes, *Colbert* is irrelevant to the question of whether Bergeron reasonably thought he could stop Young in 2003. Yet the case is relevant, as persuasive authority, to the question whether such a stop violates the Fourth Amendment at all.

5.      To be clear, Young does not contest the pat-down search but rather the portion of the search involving the rearrangement of his clothing. As to the latter portion of the search, Bergeron and Young have differing recollections of the invasiveness and duration of the search. As noted, Bergeron's testimony is accepted as true for the purposes of Young's motion for summary judgment.

6.      The court relied in part upon *Edgerly v. City & County of San Francisco*, 495 F.3d 645 (9th Cir. 2007), which had discussed the California definition approvingly. *See id.* at 656. Inexplicably, counsel for Bergeron failed to point out in their opposition that the *Edgerly* opinion has since been withdrawn pending rehearing by the panel. *See Edgerly v. City & County of San Francisco*, 527 F.3d 841 (9th Cir. 2008) (granting panel rehearing and withdrawing earlier opinion).

7.      The opinion does not indicate how the pat-down failed to reveal the baseball-sized object in Smith's underwear.

8.      The definition found at California Penal Code section 4030 was enacted before 2003.

9.      "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). There is even more reason to disregard an affidavit that has been contradicted by *later* deposition testimony. Young has objected to the two Bergeron declarations filed by defendant. To the extent that these declarations contradict Bergeron's deposition testimony, the objection is SUSTAINED. The court also SUSTAINS Young's objection to the admission of the unsworn recorded interview of Leron Habebullah. This interview was not taken under oath, and Bergeron has not indicated that Habebullah is unavailable for the purposes of filing a declaration or being deposed.

10.     The Citizens' Police Review Board and the OPD Internal Affairs Division also found that Bergeron violated the policy. *See* Haddad Dec., Exhs. F & G.